# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SAMIR ABU-LUGHOD,<br>　　　　　　Plaintiff,<br>　　　v.<br><br>SUHAIL CALIS; TOCALI, INC.; and<br>ASCII MEDIA, INC. ("ASCII"), a<br>California corporation,<br>　　　　　　Defendants. | Case No. CV 13-2792 DMG (RZx)<br><br>**ORDER RE:  DEFENDANTS'<br>MOTION FOR SUMMARY<br>JUDGMENT [127]** |

　　　　This matter is before the Court on Defendants' motion for summary judgment. [Doc. # 127.]  The Court held a hearing on the motion on January 16, 2015.  Having duly considered the parties' written submissions and oral argument, the Court **DENIES** Defendants' motion for summary judgment.

//

//

//

//

//

# I.

## **PROCEDURAL BACKGROUND**

Plaintiff Samir Abu-Lughod filed this action on April 22, 2013. On June 3, 2014, the Court granted Abu-Lughod's motion for leave to file a First Amended Complaint ("FAC"). [Doc. # 83.] On June 5, 2014, Abu-Lughod filed the operative FAC adding Magdalane Calis as a defendant to all claims,[1] along with Defendants Suhail ("Sam") Calis, Tocali Inc., and ASCII Media, Inc. (collectively, "Defendants"). [Doc. # 85.] The FAC alleges claims for (1) violation of Section 10(b) of the Securities Exchange Act; (2) violations of California securities law; (3) fraud/intentional misrepresentation; (4) negligent misrepresentation; (5) fraud based on concealment of material facts; (6) fraudulent inducement/rescission; (7) breach of fiduciary duty; (8) breach of contract; (9) quasi contract/unjust enrichment; (10) conversion; (11) violation of California's Uniform Fraudulent Transfer Act ("UFTA"); (12) lack of separate corporate existence/alter ego; and (13) an accounting. *Id*.

On November 7, 2014, Defendants filed the instant motion for summary judgment as to all claims ("Calis MSJ"). [Doc. # 127.] On December 5, 2014, Abu-Lughod filed an opposition, in which he elected to voluntarily dismiss Claims 1 and 2 (federal and state securities claims), Claim 7 (breach of fiduciary duty), and Claim 11 (UFTA). Plaintiff's Opposition to Motion for Summary Judgment ("Abu-Lughod MSJ Opp.") at 4. [Doc. # 163.] On December 19, 2014, Defendants filed a reply in further support of their motion ("Calis MSJ Reply"). [Doc. # 171.]

---

[1] On October 9, 2014, this Court granted Defendants' motion to dismiss the FAC as to Magdalane Calis on (1) the first through eighth, tenth, and twelfth claims without prejudice and (2) the ninth, eleventh, and thirteenth claims with leave to amend. [Doc. # 117.] The Court ordered Abu-Lughod to file a Second Amended Complaint within 15 days, or notify Defendants that he did not intend to do so. *Id*. On October 27, 2014, in light of Abu-Lughod's failure to file an amended complaint, this Court dismissed Magdalane Culis from the action. [Doc. # 123.]

## II.

### FACTUAL BACKGROUND

Plaintiff Samir Abu-Lughod is an individual currently residing in Canada. Calis Reply GIMF at ¶ 149. In 2006, Abu-Lughod resided in Jordan. *Id*. at ¶ 150.

Defendant Suhail ("Sam") Calis is an individual currently employed as the President and Chief Executive Officer ("CEO") of ASCII Media, Inc. Declaration of Sam Calis in Support of Motion for Summary Judgment, or, in the Alternative, Partial Summary Judgment ("Calis Decl.") at ¶ 2. [Doc. # 129.] Prior to 2006, Calis's job titles included Director of Technology, Director of Creative Engineering, Technical Director, and Lead Programmer.[2] *Id*. at ¶ 1. Before 2006, Calis worked at Disney Online, Mattel Interactive, Midway Games, MGM Studios, the Dreamer's Guild, and Vivendi Universal Games.[3] *Id*. at ¶¶ 2-7.

In 2001, Calis co-formed Tocali with his brother-in-law, David Toma. Calis Reply GIMF at ¶¶ 11-12; Calis Decl. at ¶ 6; Declaration of David Toma in Support of Motion for Summary Judgment, or, the Alternative, Partial Summary Judgment ("Toma Decl.") at ¶ 3. [Doc. # 133.]. Tocali was a California-based video game and media development company. Calis Decl. at ¶ 6. Initially, Calis and Toma were 50/50 co-owners, but shortly after Tocali's formation, Calis transferred his shares to Toma. *Id*. at ¶ 4. As of October of 2006, Toma owned all shares in Tocali. Calis Reply GIMF at ¶ 10.

---

[2] Plaintiff disputes this fact, stating that "the extent of Mr. Calis' relevant work experience and qualifications is in dispute, as discussed in the Rebuttal Expert Report of Fernando Torres." Calis Reply GIMF at ¶ 1. The Torres Report takes issue with Calis's compensation, but does not create a dispute as to whether or not Calis held these job titles. Douglas Decl., Ex. 5 ("Torres Report").

[3] *See* n. 2.

In 2005, Calis was the CEO of Tocali. *Id*. at ¶ 8. As of October of 2006, Tocali had a website, and the website listed purported Tocali clients.[4] *Id*. at ¶¶ 15-16. Tocali dissolved in 2009 because Toma did not pay its corporate fees. *Id*. at ¶¶ 13-14.

In 2006, Calis was looking for investors to help fund a computer and gaming venture. *Id*. at ¶ 27; Declaration of Plaintiff Samir Abu Lughod in Support of Opposition to Defendants' Motion for Summary Judgment ("Abu Lughod Decl.") at ¶ 4. In or around October 2006, Calis was introduced to Abu-Lughod by Abu-Lughod's niece. Calis Reply GIMF at ¶ 38. Calis and Abu-Lughod subsequently met for the first time in Abu-Lughod's office in Amman, Jordan. *Id*. at ¶ 45. All meetings between Calis and Abu-Lughod leading up to and concluding the alleged oral agreement reached between them in October 2006 ("October 2006 Agreement") took place in Amman, Jordan. *Id*. at ¶ 49. At that time, Abu-Lughod was working as a partner and auditor at Ernst & Young, and had experience reviewing financial statements of businesses. *Id*. at ¶¶ 39, 43.

Calis met with Zain—a Middle Eastern telecommunications company formerly known as Fastlink—before he met with Abu-Lughod. *Id*. at ¶¶ 31-32. The parties dispute whether the meeting resulted in a contract between Calis and Zain and there is no dispositive evidence in the record about this. Defendants contend that, at this meeting, Zain agreed to launch a Middle Eastern video game portal. *Id*. at ¶ 33. Abu-Lughod asserts that, in October of 2006, Calis represented to Abu-Lughod that he was about to sign a contract with Zain, but that Defendants have not during the course of discovery produced a signed contract or other evidence of revenue from dealings with Zain. *Id*. Defendants counter that they do not assert that the agreement was ever embodied in a signed contract, and that Tocalis's work with Zain is documented by a press release. *Id*.; Declaration of D. Michelle Douglas in Opposition to Motion for Summary Judgment as

---

[4] Plaintiff disputes the fact that the Tocali website listed its actual clients by stating that Walt Disney Company and AOL were not clients of Tocali. Calis Reply GIMF at ¶ 16. This does not create a genuine dispute as to the fact that the website existed and listed Tocali's purported clients.

to All Claims filed by Plaintiff Sami Abu-Lughod ("Douglas Decl."), Ex. 2-L, May 2007 Press Release ("Fastlink . . . announced, today, the launch of its portal's enhanced online gaming section accessed through the company's website. . . . Offered by Fastlink, in cooperation with Tocali Inc., a California based company and leading international developer of interactive entertainment software and 3D animations products, the service will be the first of its kind in Jordan."). [Doc. # 164-1.]

The parties dispute what statements were made during the meetings between Calis and Abu-Lughod leading up to the October 2006 Agreement. Abu-Lughod asserts that, at the initial meeting, Calis told Abu-Lughod that he owned and was CEO of a U.S. video game company based in California. *Id*. at ¶ 197. Defendants dispute this, contending that Calis told Abu-Lughod that he was the CEO of Tocali, not that he owned Tocali. *Id*. It is undisputed that, at this meeting, Calis told Abu-Lughod that Tocali did work for American Online and the Walt Disney Company, Tocali owned over 400 games in its video library, and the Tocali games could be utilized or repurposed for sale in the Middle East. *Id*. at ¶¶ 198-99. The record does not establish beyond genuine dispute whether these statements were true. *See id*. at ¶¶ 198-204.

It is undisputed that Calis told Abu-Lughod that Tocali was about to sign a contract with Fastlink/Zain. *Id*. at ¶ 209. Defendants contend that Calis merely used Tocali as a "placeholder" during his negotiations with Fastlink/Zain at that time. *Id*. at ¶ 34. Abu-Lughod disputes this characterization, stating that Calis always represented, and Abu-Lughod always believed, that Calis was negotiating on behalf of Tocali and with full authority to do so as its owner and CEO. *Id*.

At their third meeting in early October 2006, Abu-Lughod and Calis agreed that Abu-Lughod would invest some amount of money. *Id*. at ¶ 214. Abu-Lughod contends that he agreed to invest the money with Tocali so that it could "Arabize" its games for the Fastlink/Zain contract. In exchange, Abu-Lughod would receive fifty percent of the profits from the Fastlink/Zain contract and Calis would contribute his time, effort, and know-how to develop and fulfill the contract. *Id*. Abu-Lughod claims that they never

discussed a salary for Calis, and Defendants have not proffered any evidence of such a discussion. Abu-Lughod Decl. at ¶ 39. It is undisputed that the parties agreed that they would open a local Jordanian entity. *Id*. at ¶ 215. It is disputed whether the sole purpose of this entity was to enable Defendants to do business with Fastlink/Zain. *Id*. Abu-Lughod states in his declaration that this new Jordanian entity was created for the sole purpose of enabling Calis to do business with Fastlink/Zain in Jordan. Abu-Lughod Decl. at ¶ 34. Abu-Lughod states that, because the contract between Tocali and Fastlink/Zain was never ultimately executed, the Jordanian company never became operational. *Id*.

From October 2006 to January 2013, Calis transferred a total of approximately $214,690.84 to his family members David Toma, Christopher Calis, Aida Calis, and Margaret Calis.[5] *Id*. at ¶ 294. In his deposition, Calis states that personal checks issued to his wife were not "salary, per se," but was not otherwise able to say how they should be categorized. Calis Tr. at 193:4-25. The amount of the investment agreed to between the parties is also in dispute. Abu-Lughod states that it was $250,000. *Id*. at ¶ 214. Defendants point to the January 2007 email in which Calis states that there was a "misunderstanding" about the amount and that he believed they had agreed to an investment of $500,000. *Id*. at ¶ 203. In his declaration, Calis states that, although Abu-Lughod paid a total of $834,146 through a series of payments between October 2006 and July 2011 in connection with the 2006 Agreement, he was frequently "late making payments," and this amounted to a failure to perform his end of the agreement. Calis Decl. at ¶ 51. This cannot be reconciled with the claim that Abu-Lughod's obligation under the October 2006 Agreement was for $250,000 *or* $500,000 (as reiterated or amended in the January 2007 email). Calis' contention appears to be that Abu-Lughod's

---

[5] Defendants dispute this fact in part, stating that the evidence cited does not show any payment to Christopher Calis, and that some of the money received by Magdalene Calis came from ASCII. It is undisputed, however, that Calis paid sums of money to various family members during this time period totaling over $200,000.

obligation was to provide enough money to make the Middle East Company a "fully functional company with a presence in the local area," and not to invest any specific sum of money. *See* Calis Decl. at ¶ 52.

The parties dispute nearly all the material terms of the October 2006 Agreement. *See* Calis Reply GIMF at ¶¶ 50-54. Defendants assert that the purpose of the agreement was to create a stand-alone video game company in Jordan, and that, under the agreement, Abu-Lughod would provide the funds necessary to seed the game company in Jordan.[6] *Id*. at ¶¶ 51, 52-53; Douglas Decl., Ex. 3, January 14, 2014 Deposition of Sam Calis ("Calis Tr.") at 223:24-224:1 ("the understanding was creating a company that will become the hub in the Middle East and use my time to go out and acquire business, contracts"). According to Abu-Lughod, the parties agreed that he would invest $250,000 with Tocali so that Tocali could "Arabize" some of the games it already owned and

---

[6] Defendants assert that Abu-Lughod admits in his deposition that he believed he was investing only in a stand-alone Middle Eastern entity, not Tocalis, and that any subsequent statements to the contrary should be treated as a "sham declaration." *See* Calis Reply GIMF at ¶ 57. Defendants point to Abu-Lughod's deposition testimony, which states:

> The Reporter: "Q: And is the basis of that allegation the testimony you gave earlier, that you had reached an agreement to invest $250,000 into the Middle East Company for Development and Production of Internet Games?
> (The question was asked through the interpreter.)
> The Witness: Yes.

Declaration of Jeffrey Liu in Support of Motion for Summary Judgment, Ex. 3, Abu-Lughod Tr. at 108:13-20. [Doc. 127-1.]

The initial iteration of the question is compound, and it is therefore not clear that Abu-Lughod's answer evinces an understanding that he was investing the money *only* in the proposed Middle East Company. He states later in his deposition that the arrangement was for "projects" in the Middle East. *Id*. at 117:19-20. While discussing the January 2007 Email, Abu-Lughod agrees that the $500,000 investment was to be for the projects enumerated (including the development of http.www.tocali.com, inter alia), but that the money generated from these endeavors was not to be transferred into "some company in the Middle East." *Id*. at 122:16-123:15. The Court therefore finds that the "sham declaration" rule does not apply.

distribute them under its about-to-be-signed contract with Fastlink/Zain. Calis Reply GIMF at ¶ 50; Douglas Decl., Ex. 1, January 15, 2014 Deposition of Samir Abu-Lughod ("Abu-Lughod Tr.") at 40:13-22 [Doc. # 164-1.]; Abu-Lughod Decl. at ¶ 35.

Defendants contend that, as part of the October 2006 Agreement, Calis and Abu-Lughod agreed to share equally in any profits earned by the Middle Eastern video game company being formed. Calis Reply GIMF at ¶ 51. Abu-Lughod asserts that the parties did not intend to create a stand-alone video game agreement and that, under the agreement, he was entitled to fifty percent of the profits from *any* project of Calis' in the Middle East. *Id.* at ¶ 51; *see also* Douglas Decl., Ex. 3, Calis Tr. at 224:22-225:8 (Q.: So you had an agreement with Mr. Abu-Lughod that 50 percent – I'm sorry, that with regard to Cocolani, you would share your 50 percent with him? A.: No. I didn't discuss the terms, but, you know, the terms of my initial agreement were anything that I bring to the Middle East, we'll share 50/50 percent revenue. Q.: Uh-huh. A: And since Tocali is launched in the Middle East whatever revenue is generated from Tocali, we will share 50/50. If it means going into this entity, it will go into this entity and we'll share 50/50."). Specifically, Abu-Lughod contends that, in exchange for investing with Tocali, Plaintiff was to be entitled to fifty percent of the profits generated from the Zain/FastLink contract. Calis Reply GIMF at ¶ 50.

Calis and Abu-Lughod did not memorialize their agreement in writing in October of 2006. *Id.* at ¶ 61. In January of 2007,[7] Calis sent Abu-Lughod an email stating:

> As per our phone conversation, I am including a summary of required payments for our venture. There must have been a misunderstanding with respect to the total amount of funding as

---

[7] The email at issue is dated on its face "10/01/2007." Douglas Decl., Ex. 2-E ("January 2007 Email") at 1. [Doc. # 164-1.] Given that both parties refer to the "January 2007 email," the email refers to future events that will take place in February, and subsequent emails in the same chain are clearly dated in January and February of 2007, the Court will assume that the email at issue was sent in January of 2007. *See* Calis Reply GIMF at ¶¶ 60, 84; January 2007 Email.

I was under the impression that the total amount agreed upon was $500,000.

Ten payments of $50,000 from October through July would be ideal in insuring product development. This includes the following:

* Development on all contracts instantiated in Jordan including Fastlink, Maktoob.com, Araby.com, MobileCom, etc.

* Development of http://www.tocali.com/games for the Middle East, this is development in process. (100+ games, competitions, sponsorships, etc.) Any and all revenue generated from this portal is shared.

I estimate that by April we will have some cash flow into the company as FastLink will be mature enough and generating revenue. Also, the portal will be ready for the Middle East market by February in both English and Arabic.

What is required at this point is $100,000 for December and January as it is very crucial for us to fulfill the existing contracts and the Online Portal.

Douglas Decl., Ex. 2-E ("January 2007 Email") at 1. [Doc. # 164-1.]

Abu-Lughod contends that the January 2007 Email constitutes an amendment to the October 2006 Agreement. Calis Reply GIMF at ¶¶ 84, 146 (The "October 2006 Agreement" was "reformed and amended dramatically by the January 10, 2007 email."). Defendants assert that the January 2007 Email merely confirmed the terms reached in October 2006, and did not constitute a new or amended agreement. *Id.* ¶¶ 84, 146. Defendants note that the January 2007 Email does not set forth all of the terms of the previously-reached agreement (such as Calis's responsibilities under the contract), and therefore cannot represent the complete agreement. *Id.* at ¶ 61.

Abu-Lughod and Calis exchanged dozens of emails over the next six years. *Id.* at ¶ 62. Calis contends that the emails were in regard to their agreement to create a video

game company in the Middle East, and Abu-Lughod contends that the emails were instead concerning Abu-Lughod's investment with Tocali and ASCII. *Id*. Between October 2006 and July 2011, Abu-Lughod paid a total of around $893,146.28[8] to Calis in connection with the October 2006 Agreement. *Id*. at ¶ 67. Abu-Lughod states that he believed that he was investing in Calis's existing company, Tocali, and later on in ASCII. Abu-Lughod Decl. at ¶ 63. Abu-Lughod has never entered into a written agreement specifically with Tocali or ASCII. [9] Calis Reply GIMF at ¶¶ 108, 112. Abu-Lughod has never received or requested a stock certificate from Tocali. *Id*. at ¶ 109.

The parties dispute whether Abu-Lughod incorporated a company in Jordan called the Middle Eastern Company for Development and Production of Internet Games ("Middle Eastern Company") during this time period. *Id*. at ¶ 63. Abu-Lughod contends that his niece, Maisa Abu-Lughod, and Calis were the only owners of the Middle East Company, and that he did not incorporate or own the company. *Id*. at ¶¶ 63-65. Defendants claim that Abu-Lughod hired a lawyer to incorporate the company and provided the capital to start the company, but did not list himself as an owner of the company he incorporated. *Id*. at ¶ 64.

---

[8] Defendants state that Abu-Lughod paid a total of $843,146.00 to Calis during this time period. Calis Reply GIMF at ¶ 67. The expert report from Plaintiff's expert Jules Dorner states that Abu-Lughod transferred $893,146.28. Douglas Decl., Ex. 4 at 5. Defendants respond to this by stating that the difference in the purported amount of the total investment is immaterial for purposes of Defendants' motion for summary judgment. Calis Reply GIMF at ¶ 67. The Court will assume for the purposes of this motion that the $893,146.28 is accurate.

[9] Plaintiff disputes this fact, stating that the agreement between the Plaintiff and the Defendants was set forth in writing, and that Plaintiff's investment agreement was with *all* Defendants. Calis Reply GIMF at ¶ 108. Plaintiff has not produced a written agreement between Abu-Lughod and Tocali. Plaintiff's evidence that Abu-Lughod entered into a written agreement with Tocali is his own testimony that he believed his investment agreement to be with *all* Defendants (i.e., Calis, Tocali, and later ASCII) and the January 2007 email, which does not specify an investment in Tocali. This does not create a genuine dispute as to the fact that there is no written agreement specifying that Abu-Lughod entered into a formal relationship with Tocali itself. It is undisputed that Abu-Lughod never entered into a written agreement with ASCII that was signed under the name of ASCII.

In 2008, Calis formed and incorporated ASCII, another California-based video game and media development company, of which he is the CEO. Calis Reply GIMF at ¶¶ 18, 23. In 2009, ASCII began renting office space in Altadena, California, and continues to be operational out of that office space. *Id*. ASCII has its own staff, employees, and independent contractors, and serves clients in the United States and Europe. *Id*. at ¶¶ 21-22. The parties dispute whether ASCII was "set up" to service the Middle East or not, and whether its "primary business" was in the Middle East or the West. *Id*. at ¶¶ 36-37. Calis has testified that he was able to utilize both Tocali's and ASCII's assets for his Middle East project. *Id*. at ¶ 223. Abu-Lughod contends that the fact that Calis was able to do so without formal agreements reflecting such a transfer indicates that Calis held out the two companies as identical. *Id*. Defendants contest this characterization. *Id*. ASCII does not pay Calis a regular salary—instead, Calis takes fluctuating "draws" in various forms. *Id*. at ¶ 309.

Abu-Lughod asserts that, throughout the investment relationship, Calis represented to Abu-Lughod and others that Tocali and ASCII Media were one and the same entity and that Calis had simply changed Tocali's name to ASCII Media. *Id*. at ¶ 223. Defendants dispute that Calis made this representation. *Id*. Abu-Lughod contends that he has an ownership interest in both Tocali and ASCII. *Id*. at ¶ 107. Abu-Lughod now wants Calis to return all of the money that he received from him under the October 2006 Agreement. *Id*. at ¶ 103.

### III

### LEGAL STANDARD

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *accord Wash. Mut. Inc. v. United States*, 636 F.3d 1207, 1216 (9th Cir. 2011). Material facts are those that may affect the outcome of the case. *Nat'l Ass'n of Optometrists & Opticians v. Harris*, 682 F.3d 1144, 1147 (9th Cir. 2012)

(citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.  At the summary judgment stage, the court may not make credibility determinations or weigh conflicting evidence. *Musick v. Burke*, 913 F.2d 1390, 1394 (9th Cir.1990).

The moving party bears the initial burden of establishing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).  Once the moving party has met its initial burden, Rule 56(c) requires the nonmoving party to "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324 (quoting Fed. R. Civ. P. 56(c), (e)); *see also Norse v. City of Santa Cruz*, 629 F.3d 966, 973 (9th Cir. 2010) (*en banc*) ("Rule 56 requires the parties to set out facts they will be able to prove at trial.").  "[T]he inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).

## IV.
## DISCUSSION

At the heart of the remaining claims are the series of meetings which took place between Abu-Lughod and Calis in October of 2006, and the terms of the resulting oral agreement.  Much of the evidence for what was discussed at those meetings, and what agreements were made, comes from the competing deposition testimony and declarations of the parties themselves, and closely related witnesses (such as David Toma).  It is difficult for the Court to imagine a case in which the facts are more in dispute.  It is not the role of the court at the summary judgment stage to assess the credibility of witnesses, or weigh evidence, and therefore these claims simply cannot be resolved without a trial. The Court will address each of the remaining claims in turn.

### 1. Common Law Fraud and Misrepresentation Claims

The elements of common law fraud in California[10] are: "(1) a misrepresentation of a material fact (false representation, concealment, or nondisclosure); (2) knowledge of falsity; (3) intent to defraud, i.e., to induce reliance; (4) justifiable reliance; and (5) resulting damage." *Collins v. eMachines*, Inc., 202 Cal. App. 4th 249, 259, 134 Cal. Rptr. 3d 588, 596 (2011), *as modified* (Dec. 28, 2011). Common law intentional and negligent misrepresentation are both forms of common law fraud. *Masters v. San Bernardino Cnty. Employees Ret. Assn.*, 32 Cal. App. 4th 30, 41, 37 Cal. Rptr. 2d 860, 868 (1995). Intentional misrepresentation requires a false statement by one who does not believe it to be true, and negligent misrepresentation requires the assertion of a fact by one who has no reasonable ground for believing it to be true. *Id.* Actual damage as a result of the false statement is a necessary element of all three causes of action. *See Comm. On Children's Television, Inc. v. Gen. Foods Corp.*, 35 Cal. 3d 197, 219, 673 P.2d 660, 674 (1983) (damage is an essential element of common law fraud); *City of Vista v. Robert Thomas Sec., Inc.*, 84 Cal. App. 4th 882, 887, 101 Cal. Rptr. 2d 237, 239-40 (2000) (damage is an essential element of common law fraud, intentional misrepresentation, and negligent misrepresentation).

Abu-Lughod contends that Calis made various false statements during the meetings leading up to the October 2006 Agreement, and that he would not have invested funds with Defendants if Calis had not made these statements. Abu-Lughod MSJ Opp at 7. There are genuine disputes as to whether many of these allegedly untrue statements were made and if they are indeed false. For example, Abu-Lughod claims that Calis told

---

[10] Both parties have briefed the remaining issues at all stages of the proceedings on the assumption that California law applies. Neither side has addressed the choice of law. Because, through their course of conduct, the parties appear to have waived any objection to the application of California law, the Court will likewise apply California law . *See Nagrampa v. MailCoups, Inc.*, 469 F.3d 1257, 1267 (9th Cir. 2006) (California law applied in spite of a Massachusetts choice-of-law clause provision because "the parties through their course of conduct have waived the provision of the agreement that specifies the application of Massachusetts law.").

him in their initial meeting that he owned Tocali, and that Abu-Lughod would not have invested any funds with Defendants if he knew that Calis did not own Tocali. Defendants dispute that Calis told Abu-Lughod that he owned Tocali at the time of their first meeting. Abu-Lughod also contends that Calis made various statements regarding the fact that Tocali owned over 400 games, how these games could be used and sold, and how he planned to "Arabize" these games to make them marketable in the Middle East. There are genuine disputes as to which of these statements were actually made, and the record does not clearly establish which of these statements are actually true. *See* Calis Reply GIMF at ¶¶ 199-204. Abu-Lughod asserts that, during the meetings, Calis told him about an imminent contract with Fastlink/Zain, and now believes that such a contract was never signed. Defendants contend that even if the agreement was never put into writing, there is evidence that Calis has done business with and been paid for work with Zain/Fastlink. Other than a press release, that evidence is not in the current record.

There are genuine issues of material fact as to whether false statements were made, whether those allegedly false statements were made knowingly or negligently, whether those statements justifiably induced reliance, and whether Abu-Lughod suffered any damage as a result of relying on those statements. These questions of fact prevent the grant of summary judgment regarding the common law fraud and misrepresentation claims.

**2. Breach of Contract Claim**

A cause of action for breach of contract requires: (1) the existence of a contract; (2) plaintiff's performance or excuse for nonperformance; (3) defendant's breach; and (4) resulting damages to the plaintiff. *Durell v. Sharp Healthcare*, 183 Cal. App. 4th 1350, 1367, 108 Cal. Rptr. 3d 682, 697 (2010).

As noted above, there are genuine disputes as to the terms of the October 2006 Agreement. Abu-Lughod contends that he agreed to invest money with Tocali so that it could "Arabize" its games for the Fastlink/Zain contract. Defendants assert that the

investment was for the establishment of a stand-alone video game company in Jordan and other projects and contracts (as described in the January 2007 email). The parties also dispute the amount of money that was to have been invested.

The parties dispute even which persons or entities were a party to the contract. Defendants assert that Abu-Lughod cannot show that he contracted with either Tocali or ASCII. Abu-Lughod asserts that, at the time the agreement was formed, he understood himself to be investing in Tocali and later in ASCII. It is undisputed that Abu-Lughod never signed a written agreement specifically with Tocali or ASCII. It is contested, however, whether or not Calis represented to Abu-Lughod that he was investing in Tocali (and whether he told Abu-Lughod that Tocali later simply changed its name to ASCII). As CEO of Tocali at the time and later ASCII, Calis would have been in a position to make those representations and to potentially enter into an agreement on behalf of Tocali or ASCII. *See, e.g.*, *Mosher v. Mayacamas Corp.*, 215 Cal. App. 3d 1, 3, 263 Cal. Rptr. 373, 374 (1989) (CEO prepared contract for sale of company in his capacity as CEO). The Court draws all reasonable inferences in favor of Abu-Lughod on this motion for summary judgment.

More specifically, Abu-Lughod contends that the parties entered into a binding and enforceable contract whereby Plaintiff agreed to put forth the capital and Defendants agreed to put forth the effort, time and know-how, and pursuant to which the parties agreed they would share any profits generated from their investment on an equal basis. Abu-Lughod MSJ Opp. at 3. Abu-Lughod contends that they never discussed a salary for Calis. Abu-Lughod Decl. at ¶ 39. Abu-Lughod asserts that Defendants breached the agreement by spending significant portions of the funds invested on Calis' personal expenses and family members, rather than on the specific expenses and projects described to Abu-Lughod. Abu-Lughod MSJ Opp at 3-4. Defendants, on the other hand, maintain that the October 2006 agreement was that Abu-Lughod and Calis would form, fund, and operate a video game development company in the Middle East that would cater exclusively to consumers in the region. Calis MSJ at 1, 3. Defendants do not

adduce any evidence dispositive of the issue of whether Calis was entitled to use portions of the funds given to him by Abu-Lughod for personal expenses or payments to family members. Because there are disputed facts as to the material terms of the contract, it cannot be established on summary judgment whether the contract has been breached, or whether the parties have performed. Because there are credibility issues in spades, and thus genuine disputes of fact as to what the terms of the contract were, summary judgment as to the breach of contract claim for the October 2006 Agreement is not warranted.

### 3.    Quasi-Contract and Unjust Enrichment

Under California law, the elements of a quasi-contract are "[a] promise which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise." *Peterson Tractor Co. v. Orlando's Snack-Mobile Corp.*, 270 Cal. App. 2d 787, 790, 76 Cal. Rptr. 221, 224 (1969). Defendants' motion for summary judgment as to the quasi-contract claim must fail for the same reasons as the breach of contract claim. There are genuine issues of material fact as to what statements were made and whether Defendants should have reasonably expected Abu-Lughod to rely on any such statements.

Defendants are correct in their assertion that unjust enrichment is not an independent cause of action in California but a remedy. *Smith v. Ford Motor Co.*, 462 F. App'x 660, 665 (9th Cir. 2011). There must be a cognizable quasi-contract theory or some other form of misconduct with an unjust enrichment claim to stand. *Id*. Once again, because the quasi-contract claims cannot be resolved at this stage, the unjust enrichment remedy also stands.

### 4.    Conversion Claim

A cause of action for conversion requires:  (1) allegations of plaintiff's ownership or right to possession of property; (2) defendant's wrongful act toward or disposition of

the property, interfering with plaintiff's possession, and (3) damage to plaintiff. *PCO, Inc. v. Christensen, Miller, Fink, Jacobs, Glaser, Weil & Shapiro, LLP*, 150 Cal. App. 4th 384, 395, 58 Cal. Rptr. 3d 516, 524 (2007) (internal citation and quotation marks omitted). "Money cannot be the subject of a cause of action for conversion unless there is a specific, identifiable sum involved, such as where an agent accepts a sum of money to be paid to another and fails to make the payment." *Id*. A "generalized claim for money is not actionable as conversion." *Id*. "California cases permitting an action for conversion of money *typically* involve those who have misappropriated, commingled, or misapplied specific funds held for the benefit of others." *Welco Electronics, Inc. v. Mora*, 223 Cal. App. 4th 202, 216, 166 Cal. Rptr. 3d 877, 888 (2014), *reh'g denied* (Feb. 19, 2014).

Abu-Lughod does not specify precisely which funds constitute the "specific, identifiable sum" that is the subject of the conversion cause of action here. Abu-Lughod, however, seeks the entire amount of his $893,146.28 investment, so presumably contends that this is the "identifiable sum" in question. *See* FAC at ¶ 91. Because Abu-Lughod contends that he was fraudulently induced to invest the entire sum of money, and that he would not otherwise have invested with Defendants, he has at least stated a claim for conversion of a specific amount of money. There are genuine disputes of fact as to whether Abu-Lughod had ownership or right to possession of the property at issue, hinging on whether his entire investment of the money was fraudulently induced or only that portion that was used for Calis' personal expenses or payments to family members. There are also genuine disputes of fact as to whether Defendants acted wrongfully in their use of that sum of money, and whether Defendants' purported wrongful acts interfered with Plaintiff's possession of the property.

Drawing all inferences in favor of the non-moving party, Abu-Lughod has adequately identified a specific sum of money he alleges was unlawfully converted. There are genuine disputes of material fact regarding the essential elements of conversion, and summary judgment on this claim is therefore denied.

### 5. Alter Ego Claim

Defendants seek summary judgment on the alter ego "claim," pointing out that it is not an independent cause of action. While that may be true, Plaintiff is entitled to present evidence of alter ego in order to establish that all Defendants are jointly and severally liable for any damages that may result from a jury verdict.

"Ordinarily, a corporation is regarded as a legal entity separate and distinct from its stockholders, officers and directors. Under the alter ego doctrine, however, where a corporation is used by an individual or individuals, or by another corporation, to perpetrate fraud, circumvent a statute, or accomplish some other wrongful or inequitable purpose, a court may disregard the corporate entity and treat the corporation's acts as if they were done by the persons actually controlling the corporation." *Robbins v. Blecher*, 52 Cal.App.4th 886, 892, 60 Cal.Rptr.2d 815 (1997). "In general, the two requirements for applying the alter ego doctrine are that (1) there is such a unity of interest and ownership between the corporation and the individual or organization controlling it that their separate personalities no longer exist, and (2) failure to disregard the corporate entity would sanction a fraud or promote injustice." *Id*.

In determining whether there is a "unity of interest," courts will consider factors which include inadequate capitalization, commingling of funds and other assets, holding out by one entity that is liable for the debts of the other, identical equitable ownership, use of the same offices and employees, use of one as a mere conduit for the affairs of the other, disregard of corporate formalities, lack of segregation of corporate records, and identical directors and officers." *VirtualMagic Asia, Inc. v. Fil–Cartoons, Inc.*, 99 Cal. App. 4th 228, 245, 121 Cal. Rptr. 2d 1 (2002).

"The purpose behind the alter ego doctrine is to prevent defendants who are the alter egos of a sham corporation from escaping personal liability for its debts." *Hennessey's Tavern, Inc. v. Am. Air Filter Co.*, 204 Cal. App. 3d 1351, 1358, 251 Cal. Rptr. 859 (1988). While the alter ego issue is generally raised by the pleadings, even when not pleaded, the issue may be resolved at trial. *Id*. Alter ego theory is a means of

imposing liability for an underlying cause of action, and is not a cause of action in and of itself. *Smith v. Simmons*, 638 F. Supp. 2d 1180, 1190 (E.D. Cal. 2009), *aff'd*, 409 F. App'x 88 (9th Cir. 2010).

Once again, there are disputed issues of fact regarding whether Calis may have used Tocali or ASCII to perpetrate fraud or for another wrongful purpose. There are some factors supporting the unity of interest between Calis and the corporations (e.g., Calis was the CEO of both, the assets of both appear to have been used somewhat interchangeably for Calis's projects, and a general lack of corporate formalities). Given that there are disputed facts as to whether Calis or the corporate defendants perpetrated any kind of fraud in the first place, the alter ego theory of recovery cannot be resolved at the summary judgment stage. Abu-Lughod cannot maintain a stand-alone alter ego claim, but if he prevails on his substantive fraud or contract claims, he may be able to recover damages from all Defendants under this theory.

### 6. Accounting Claim

Abu-Lughod has agreed to dismiss his request for an accounting as a stand-alone cause of action as long as he can seek a remedy of accounting at trial. Abu-Lughod MSJ Opp. at 26. Defendants contend that the accounting claim is moot because Abu-Lughod has received multiple expert reports from Defendants' experts which provide all of his accounting needs. Calis MSJ at 34-35; Calis MSJ Reply at 2-3. Particularly given that Abu-Lughod has disputed the accuracy and admissibility of those reports, the record does not establish conclusively that any accounting requested by Abu-Lughod is now moot as a result of the expert reports Defendants elected to provide. *See* Galis Reply GIMF at Proposed Conclusions of Law at ¶ 46. Abu-Lughod's request to seek a remedy of accounting at trial survives summary judgment.

### 7.    **Time-Bar Issues**[11]

Defendants assert that Abu-Lughod's claims are all time-barred.  Calis MSJ at ii-iii.  Abu-Lughod asserts that the common law "discovery rule" applies to all claims, and prevents them from being time-barred.  Abu-Lughod MSJ Opp at 13-14.  The "discovery rule" provides that the accrual date of a cause of action "may be delayed until the plaintiff is aware of her injury and its negligent cause." *Fuller v. Tucker*, 84 Cal. App. 4th 1163, 1171, 101 Cal. Rptr. 2d 776 (2000).

Under California law, there is a three-year statute of limitations on a claim for conversion.  *See* Cal. Civ. Proc. Code § 338(c) (three-year statute of limitations); *AmerUS Life Ins.Co. v. Bank of Am., N.A.*, 143 13 Cal. App. 4th 631, 639 (2006) ("the statute of limitations for conversion is triggered by the act of wrongfully taking property").  The discovery rule only applies to a conversion action when the defendant "fraudulently conceals the relevant facts or where the defendant fails to disclose such facts in violation of his or her fiduciary duty to the plaintiff." *Id*.  In such cases, "the statute of limitations does not commence to run until the aggrieved party discovers or ought to have discovered the cause of action for conversion." *Id*.  "It is well settled that resolution of the statute of limitations issue is normally a question of fact." *Fox v. Ethicon Endo-Surgery, Inc.*, 35 Ca. 4th 797, 810 (Cal. 2005) (internal citation omitted).

Abu-Lughod contends that he was not aware of the facts giving rise to this or the other causes of action until within the statute of limitations period, in part because Defendants fraudulently concealed from him the relationship between Calis, Tocali, and ASCII.  Abu-Lughod MSJP Opp. at 14-17, 25-26.  Defendants assert that Abu-Lughod had a duty to investigate sooner than he did, particularly given his qualifications as a

---

[11] Defendants contend that Abu-Lughod has conceded the issue of untimeliness of the breach of contract claim because he has failed to address it in his Opposition. Calis MSJ Reply at 2.  This Court finds that Abu-Lughod's general arguments about the applicable statutes of limitations, application of the discovery rule, and potential notice of facts giving rise to the claims sufficiently address the time-bar issue and that this issue is not waived.

partner and auditor at Ernst & Young. Calis MSJ at 12-13 ("Any reasonably diligent investor would have asked about the change [in email address used by Calis.]"). There are genuine disputes of fact as to the circumstances that would have given rise to Abu-Lughod's duty to investigate (for example, the parties dispute whether Calis told Abu-Lughod that Tocali was simply changing its name to ASCII, and that the two were the same entity).

The statute of limitations applicable to a cause of action for breach of oral contract is two years. Cal. Civ. Proc. Code § 339. The statute of limitations for a quasi-contract or a claim of fraud or mistake is three years, and does not accrue until the discovery by the aggrieved part of the facts constituting the fraud or mistake. Cal. Civ. Proc. Code § 338(d); *see Creditors Collection Serv. of Orange Cnty. v. Castaldi*, 23 Cal. App. 4th Supp. 1, 29 Cal. Rptr. 2d 354, 356 (1994) ("A quasi-contract action, in the form of a common count for money had and received, to recover money obtained by fraud or mistake, is governed by section 338(d).").

"The statute of limitations on a cause of action for breach of an executory contract generally does not begin to run until the time for full performance has arrived." *State Comp. Ins. Fund v. WallDesign Inc.*, 199 Cal. App. 4th 1525, 1530, 132 Cal. Rptr. 3d 352, 356 (2011). "[T]he discovery rule may be applied to breaches [of contract] which can be, and are, committed in secret and, moreover, where the harm flowing from those breaches will not be reasonably discoverable by plaintiffs until a future time." *Apr. Enterprises, Inc. v. KTTV*, 147 Cal. App. 3d 805, 832, 195 Cal. Rptr. 421, 437 (1983). Generally, "the injury or the act causing the injury, or both, [must] have been difficult for the plaintiff to detect." *NBCUniversal Media, LLC v. Superior Court*, 225 Cal. App. 4th 1222, 1232, 171 Cal. Rptr. 3d 1, 9 (2014).

Neither party puts forth any evidence as to how, exactly, Abu-Lughod discovered the information regarding the alleged breaches of contract. In the FAC, Abu-Lughod states that "[i]n or around January 2013, [he] learned that, on information and belief, the majority fo the investment funds Abu-Lughod forwarded to Calis and/or the Company

were routed to various family members of Calis." FAC at ¶ 26. The FAC states that Abu-Lughod's "further investigation" revealed additional facts which Abu-Lughod asserts constitute the breach of contract. Similarly, in his declaration, Abu-Lughod states that "[a]fter Calis ceased communicating with me after I sent him the January 24, 2013 [email], I learned in late January 2013 the following [facts relevant to the alleged breach of contract]," including the fact that "the majority of the investment funds I transferred to the Defendants were routed to Calis' various family members and not used for business purposes." Abu-Lughod Decl. at ¶¶ 124-125.

Because no facts are set forth regarding how Abu-Lughod learned this information, what steps he took to investigate, and whether the information was accessible to him prior to January of 2013, the Court cannot determine whether the alleged breaches took place in secret or whether the information regarding the breaches was difficult for Abu-Lughod to detect. Given that Abu-Lughod is seeking an accounting as one of his requested remedies, it is unlikely that he had access to the financial records that would have shown the transfers of money to Calis' family members. Because Defendants are the moving party, they bear the burden of establishing that there is no triable issue of fact as to whether the discovery rule may be applied here. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). There are simply not enough facts in the record to determine whether the discovery rule applies, and so the Court cannot find as a matter of law that it does not.

The statute of limitations for a fraud action is also three years. Cal. Civ. Proc. Code §338(d). Defendants contend that the statute of limitations begins to run when the plaintiff has "reason to suspect" an injury and some wrongful cause, unless the plaintiff pleads and proves that a reasonable investigation at that time would not have revealed a factual basis for that particular cause of action. Calis MSJ at 27, n. 55. Defendants contend that the three facts that could have triggered a "reason to suspect" wrong-doing were the change in Calis's email address from Tocalis to ASCII, Calis's request that Abu-Lughod deposit funds to an ASCII account, and the fact that Abu-Lughod could

have run an Internet search to discover information about the company. Calis MSJ at 12-13. Abu-Lughod responds that when Calis used the new email address and asked him to deposit funds to an ASCII account, Calis assured him that ASCII was simply the same company by another name. Calis Reply GIMF at ¶ 223. Abu-Lughod asserts that he and Calis had a trusting relationship and were introduced by family members, and so he was not inclined to doubt Calis's representations. This creates at least a triable question of fact about whether there was "reason to suspect" wrong-doing that would have caused the statute of limitations to begin to run.

Given that there are genuine disputes as to the terms of the contract or any quasi-contract, the performance contracted for, and whether there was ever a written agreement, the Court cannot and does not find as a matter of law that the breach of contract or quasi-contract claim is time-barred under California law.

# V.

## CONCLUSION

In light of the foregoing, the Court **GRANTS** Defendants' motion for summary judgment as to Claims 1 and 2 (federal and state securities claims), Claim 7 (breach of fiduciary duty), and Claim 11 (UFTA).[12]  The Court **DENIES** Defendants' motion for summary judgment in all other respects.

The Court notes that the FAC alleges that Plaintiff Abu-Lughod is a "resident" of Ontario, Canada.  To invoke diversity jurisdiction, Plaintiff must allege his citizenship, not merely his residence.  *Kanter v. Warner –Lambert Co.*, 265 F.3d 853, 857 (9th Cir. 2001).  By no later than **February 4, 2015**, Plaintiff Abu-Lughod is ordered to show cause why diversity jurisdiction exists in this case.

**IT IS SO ORDERED.**

DATED:  January 21, 2015

_____
DOLLY M. GEE
UNITED STATES DISTRICT JUDGE

---

[12] Claims 12 (alter ego) and 13 (accounting) are not independent causes of action as they are a theory for joint and several liability and a remedy, respectively.